IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Bridgewater Dairy, LLC, et al., | Case No. 3:07 CV 104 |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| United States Department of Agriculture, | |
| Defendant. | |

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 3), to which Plaintiffs filed a Supplemental Memorandum (Doc. No. 18), Defendant filed a Memorandum in Opposition (Doc. No. 31), Defendant-Intervenors filed a Brief in Opposition (Doc. No. 30), and Plaintiffs filed a Reply (Doc. No. 40). The Court also considered both *amicus curiae* briefs (Doc. Nos. 28, 35), and all supplemental briefing (Doc. Nos. 42 through 46).

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. §§1331 and 1337 and 5 U.S.C. § 705. For the reasons detailed below, Plaintiffs' Motion is denied.

### BACKGROUND

The United States Department of Agriculture (USDA) has statutory authority to regulate the dairy industry. *See* 7 U.S.C. § 601-674. Specifically, the Agricultural Marketing Agreement Act of 1937 (AMAA) authorizes the Secretary of Agriculture (Secretary) to issue and amend federal milk marketing orders which set the minimum prices "which those who process dairy products, designated as handlers (as defined in 7 C.F.R. § 1040.9 (1994)), must pay to dairy farmers, designated as producers (as defined in 7 C.F.R. § 1040.12 (1994))." *Lansing Dairy v. Espy*, 39 F.3d 1339, 1342 (6th

Cir. 1994). These minimum prices guarantee that producers will receive a uniform minimum price for their milk, regardless of its end-use.

To calculate these minimum prices, the USDA has grouped the end-uses of milk into four classes: Class I (fluid milk); Class II (creams, including ice cream, sour cream, and yogurt); Class III (cheese); and Class IV (evaporated milk, dried milk, and butter). Handlers pay different prices for each Class, but producers receive a uniform "blend price" regardless of the end-use of the milk they produce.

Minimum class prices are calculated on a monthly basis based upon a codified regulatory formula. Each formula takes into account market prices[1] and contains a "make allowance" factor. The make allowance represents the cost that handlers incur in converting raw milk into one pound of product. The parties here have stipulated that the make allowance is inversely proportional to the price that producers receive for their raw milk; that is, if the make allowance is increased, the price that producers receive for raw milk will decrease. At issue in the instant action is a proposed make-allowance increase.

On December 29, 2006, after a year of administrative proceedings,[2] the USDA promulgated an Interim Order (final rule), effective February 1, 2007. The administrative proceedings were essentially limited to testimony regarding the appropriate level for make allowances, and Defendants

---

[1] Market prices are determined by a survey of the prices of certain products (butter, cheese, dry whey, etc.) conducted by the National Agricultural Statistics Service (NASS).

[2] The USDA issued a *Notice of Hearing* on December 30, 2005, and convened a hearing on January 24, 2006. *See* 71 Fed. Reg. 545 (Jan. 5, 2006). The hearing was reconvened on September 14, 2006, for the introduction of further evidence, namely a survey of plant manufacturing costs commissioned from Cornell University. *See* 71 Fed. Reg. 52502 (Sept. 6, 2006). Subsequently, a *Tentative Final Decision* was issued on November 17, 2006, which invited written comments. *See* 71 Fed. Reg. 67467 (Nov. 30, 2006).

concede that no direct testimony was allowed as to the Section 608c(18) factors. The Interim Order "amend[ed] the manufacturing (make) allowances contained in the Class III and Class IV product price formulas applicable to all Federal milk marketing orders." 71 Fed. Reg. 78333 (Dec. 29, 2006). The economic analysis, commissioned and considered by the USDA, estimates that producer cash receipts will be decreased by an average of $125 million per year over the next nine years, with the largest reduction ($195 million) realized in the first year after implementation (USDA Economic Analysis, Doc. No. 4, Ex. C, pp.13, 15).

Plaintiffs filed the instant action on January 12, 2007, claiming that the Secretary failed to consider certain statutory factors when making the decision to raise make allowances. Specifically, Plaintiffs contend that the AMAA requires the Secretary, when changing minimum milk prices, to consider "the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products." 7 U.S.C. § 608c(18). Defendant and Defendant-Intervenors (hereafter "Defendants") contend, based on their reading of the statute, that the Secretary is not required to consider these factors. Further, Defendants contend that the Section 608c(18) factors are accounted for indirectly in the product price formulas, and this is sufficient to satisfy the statute.

Plaintiffs filed a Motion for Temporary Restraining Order and/or Preliminary Injunction and for Expedited Hearing (Doc. No. 3) on January 16, 2007. After telephone conferences on January 16 and 17, 2007, and in lieu of granting a temporary restraining order, the USDA agreed to delay the release date of the Interim Final Rule until February 23, 2007. The parties fully briefed the issues, and a Preliminary Injunction Hearing was held on February 15, 2007.

## DISCUSSION

### Preliminary Injunction Standard

The granting or denial of a preliminary injunction is within the sound discretion of the trial court. *Virginia Railway Co. v. System Federation, R.E.D.*, 300 U.S. 515, 551 (1937). The Sixth Circuit has set forth four factors for the District Court to consider when making this determination: (1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; (2) whether the plaintiffs have shown that irreparable injury will result if the preliminary injunction is not granted; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether issuing a preliminary injunction would serve the public interest. *Mich. Bell Tel. Co. v. Engler,* 257 F.3d 587, 592 (6th Cir. 2001); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 564 (6th Cir. 1982). These are not elements which must be satisfied; rather, they are factors which the Court must balance.

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curium) (citation omitted) (emphasis in original). Indeed, the "proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion, for example" because the preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks and citations omitted).

**Likelihood of Success on the Merits**

When considering whether to grant a preliminary injunction, the Court must consider "[w]hether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits." *United States v. Detroit Int'l Bridge Co.*, 7 F.3d 497, 503 (6th Cir. 1993) (citing *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977)). The "likelihood of success on the merits" that Plaintiffs must demonstrate is inversely proportional to the amount of "irreparable harm" that will be suffered absent injunctive relief. *Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002). However, "in order to justify [injunctive relief], the defendant must demonstrate at least serious questions going to the merits and irreparable harm that decidedly outweighs the harm that will be inflicted on others if a stay is granted." *Id*. (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

Although "likelihood of success" is merely one of four factors to be considered, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. National Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)). Indeed, the "likelihood of success" factor is "the weightiest of the four." *Wilson v. Lexington-Fayette Urban County Gov't*, No. 05-5923, 2006 U.S. App. LEXIS 25617, at *18 (6th Cir. Oct. 11, 2006) (citing *Gonzales*, 225 F.3d at 625) (affirming the denial of a preliminary injunction despite the fact that the district court's opinion only addressed the "likelihood of success" factor).

**Statutory Interpretation**

Plaintiffs contend that 7 U.S.C. § 608c(18) requires the Secretary to consider feed prices and supplies as well as other economic conditions which affect market supply and demand. Defendants,

on the other hand, argue that a plain reading of the statute reveals that the Secretary did not have to consider these factors.

>7 U.S.C. § 608c(18) states:
>
>(18) Milk prices. The Secretary of Agriculture, prior to prescribing any term in any marketing agreement or order, or amendment thereto, relating to milk or its products, if such term is to fix minimum prices to be paid to producers or associations of producers, or prior to modifying the price fixed in any such term, shall ascertain the parity prices of such commodities. The prices which it is declared to be the policy of Congress to establish in section 2 of this title shall, for the purposes of such agreement, order, or amendment, be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area which the contemplated marketing agreement, order, or amendment relates. Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 8b or 8c, as the case may be, that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest. Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices.[3]

Plaintiffs contend that this section mandates that the Secretary must consider feed prices and feed supplies every time that it promulgates a rule which affects the minimum class prices. Defendants advocate a sentence-by-sentence examination of this section, with the following result: (1) sentence one requires the Secretary to first ascertain the parity price; (2) sentence two requires that these parity prices must be adjusted to reflect the price and supply of feeds; (3) sentence three states that if parity

---

[3]

There is disagreement amongst the parties as to the exact text of this section. Specifically, Plaintiffs contend that the phrase "to meet current needs and further to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs" should be inserted into the third sentence of Section 608c(18), after "pure and wholesome milk." This phrase, however, was added in an amendment which eventually expired on December 31, 1996. *See* 97 P.L. 98, at § 101(b) (1981), last amended by 107 Stat. 312, 317, 103 P.L. 66, at § 1005(b) (1993). Accordingly, the Court has considered the above-quoted version of 7 U.S.C. § 608c(18).

6

prices need to be adjusted, the Secretary must fix prices that reflect feed price, feed supply, and other factors; and (4) after these prices are fixed, the Secretary can adjust the prices as he "finds necessary" upon "changed circumstances." Defendants contend that under Plaintiffs' interpretation of this section, the fourth sentence has absolutely no meaning.

Defendants argue that the administrative action here, *i.e.* a modification of the make allowance, falls within the fourth sentence of Section 608c(18), meaning that the Secretary was not required to directly consider feed prices and supply. Further, Defendants contend that under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984), the Secretary's interpretation of Section 608c(18) is to be accorded substantial deference. Specifically, the Sixth Circuit has described the intricacies of milk market regulation as being "of labyrinthine complexity." *Lansing Dairy v. Espy*, 39 F.3d 1339, 1344 (6th Cir. 1994). If this statute is indeed ambiguous, then the Court should defer to the Secretary's interpretation:

> If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 697, 980 (2005) (citing *Chevron*, 467 U.S. at 843-44, and n.11).

Plaintiffs contend that the Sixth Circuit's decision in *Lansing Dairy* "held that compliance with the requirements of 608c(18) was required in setting minimum price formulas" (Pls' Memo., Doc. No. 4, pp.9-10) (citing *Lansing Dairy*, 39 F.3d at 1352-53). This was not the holding of *Lansing Dairy*; rather, it was merely mentioned in passing. The *Lansing Dairy* court held that the Secretary's interpretation of the AMAA, namely "that he need not undertake a § 608c(18) economic analysis before modifying location adjustments pursuant to 608c(5)," was reasonable and thus entitled to

7

*Chevron* deference. *Lansing Dairy*, 39 F.3d at 1358. This decision actually favors Defendants here: the Sixth Circuit specifically held that Section 608c(18) was ambiguous and subject to multiple reasonable interpretations:

> The AMAA, and §§ 608c(5) and 608c(18) in particular, like much of federal legislation is not a model of clarity or succinctness. The interpretations of both the district court and the Secretary are reasonable and arguably can be supported by the language of the Act. However, we find that neither construction supports a finding that Congress has directly spoken on the "precise question at issue;" therefore, neither the plaintiffs' nor the Secretary's interpretation "gives effect to the unambiguously expressed intent of Congress."

*Id*. at 1351 (quoting *Chevron*, 467 U.S. at 842-43). The *Lansing Dairy* decision is consistent with Defendants' position here, because under Defendants' interpretation of Section 608c(18), the modification of location adjustments at issue in *Lansing Dairy* falls within the fourth sentence of Section 608c(18) (and is thus exempt from the requirements of the second and third sentences) because it is not part of the initial fixing of prices alluded to in the third sentence of Section 608c(18).

Plaintiffs contend they should prevail because *St. Albans Coop. Creamery, Inc. v. Glickman*, 68 F. Supp. 2d 380 (D. Vt. 1999) is "on all fours." In that case, the plaintiffs (a group of producers) were granted a temporary restraining order enjoining a Final Rule and Order which realigned and consolidated federal milk marketing orders under the Federal Agricultural Improvement and Reform Act (the FAIR Act). The *St. Albans* court held, under the AMAA, "the establishment of milk prices cannot be made without consideration of 'the price of feeds, the available supplies of feeds, and other economic conditions which effect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates.'" *Id*. at 388 (quoting 7 U.S.C. § 608c(18)). Defendants argue *St. Albons* has no persuasive value because (1) it is not a final judgment, (2) it is from the District of Vermont, and (3) most importantly, a few months

8

after the ruling was issued, Congress specifically overruled the decision. *See* 106 P.L. 113, 113 Stat. 1501 (Nov. 29, 1999); *see also* 64 Fed. Reg. 70867, 70868 (Dec. 17, 1999). *St. Albons* certainly supports Plaintiffs' interpretation of Section 608c(18), but it is not binding on this Court and, furthermore, any persuasive value is severely undermined by Congress' direct action a few months after the decision.

Moreover, the legislative history of this Section is instructive. Subsection (18) was added to 7 U.S.C. § 608c in 1937. *See* 50 Stat. 246, 247 (June 3, 1937). When discussing the fourth sentence of subsection (18), Congress expressed a clear intent that adjustments under the fourth sentence are subject to the same requirements as amendments under the third sentence. For instance, the House report on the AMAA contains the following commentary:

> The proposed amendment . . . provides that if the Secretary finds that the national parity price for milk does not adequately reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the marketing area to which the marketing agreement or order relates, he shall fix such prices as will reflect such factors, insure a sufficient quantity of pure wholesome milk, and be in the public interest. **The proposed amendment further provides that as the Secretary finds necessary on account of changed circumstances, he shall make adjustments in such prices. Such adjustments are to made in accordance with the same standards as are provided for the initial fixing of prices under this subsection.**

H.R. Rep. No. 75-468, at 3 (1937) (emphasis added); *see also Lansing Dairy*, 39 F.3d at 1352. The Senate Report reflects a similar sentiment:

> The intricate problems of the milk industry as described in the above cited opinion, explain the use of the several pooling and price plans authorized for inclusion in milk orders. Their effectiveness depends upon their adaptability to conditions affecting each marketing area and upon their adjustment from time to time to meet changing conditions. **The Secretary is to use the same standard in adjusting prices as is to be used in the fixing of prices initially in the regulation of any marketing area.**

9

S. Rep. No. 75-565, at 3 (1937); *see also Lansing Dairy*, 39 F.3d at 1352. In *Lansing Dairy*, the Sixth Circuit remarked "that the last two sentences of both reports are troubling," although it eventually concluded that "this language is as fraught with ambiguity as the text of the Act itself." *Lansing Dairy*, 39 F.3d at 1352-53. While this language may have been unclear in the context of the *Lansing Dairy* decision, it seems quite clear in the present context: both houses of Congress intended, at the time of the 1937 AMAA, that the Secretary should use the same standard under both the third and fourth sentences of Section 608c(18).

Although both sides expended significant effort briefing and arguing this issue, the Court finds it unnecessary to reach the merits. Regardless of whether Section 608c(18) requires the Secretary to consider feed prices and supplies when amending make allowances, Plaintiffs cannot succeed on the merits because, as detailed below, these factors were given appropriate consideration.

### Indirect Consideration of the Section 608c(18) Factors

Defendants contend that even if the Secretary was required to consider the Section 608c(18) factors, these factors are reflected, albeit indirectly, in the current product-price formulas. The Court agrees.

In a final decision issued November 7, 2002, the USDA explained in detail how the Section 608c(18) factors are accounted for under the current product-price-formula system:

> The [AMAA] stipulates that the price of feeds, the availability of feeds, and other economic conditions which affect market supply and demand for milk and its products be taken into account in the determination of milk prices. This requirement currently is fulfilled by the Class III and Class IV component price calculations. If conditions increase supply costs, the quantity of milk produced would be reduced due to lower profit margins. As the milk supply declines, plants buying manufacturing milk would pay a higher price to maintain an adequate supply of milk to meet their needs. As the resulting farm profit margins increase, so should the supply of milk. Likewise, the reverse would occur if economic conditions reduce supply costs. The price of feed is not directly included in the determination of the price for milk, but rather is one

10

> economic condition which may cause a situation in which the price of milk may increase or decrease. A change in feed prices may not necessarily result in a change in milk prices. For instance, if the price of feed increases but the demand for cheese declines, the milk price may not increase since milk plants would need less milk and therefore would not bid the price up in response to lower milk supplies. Also, other economic conditions could more than offset a change in feed prices and thus not necessitate a change in milk prices.
>
> The pricing system, according to the recommended decision, accounted for changes in feed costs, feed supplies, and other economic conditions, as explained above. The product price formulas adopted in the recommended decision would reflect accurately the market values of the products made from producer milk used in manufacturing. As supply costs increase with a resulting decline in production, commodity prices would increase as manufacturers secure additional milk to meet their needs. Such increases in commodity prices would mean higher prices for milk. The opposite would be true if supply costs were declining.

67 Fed. Reg. 67906, 67911-12 (Nov. 7, 2002).

Section 608c(18) does not specifically state that the Secretary must receive direct evidence of producer costs. Rather, this section only requires that the Secretary fix minimum prices which are "adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products." As explained above by the USDA, the pricing system currently in place (*i.e.* the Class III and Class IV product-price formulas) has been designed to account for these factors. *Id*. The USDA's Interim Order only modifies the amount of the make allowances; it does not modify the portion of the formulas which indirectly incorporates feed costs or supply. Therefore, even with increased make allowances, the fluctuating minimum milk prices are still "adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products."

Even if Section 608c(18) is read to require consideration of these factors, they have been given appropriate consideration. Accordingly, Plaintiffs are unlikely to succeed on the merits in this matter.

11

**Balance of Hardships and Public Interest**

Next, the Court must consider the other three preliminary-injunction factors: (1) irreparable harm to Plaintiffs if the preliminary injunction is not granted; (2) whether the issuance of a preliminary injunction would cause substantial harm to others; and (3) whether issuing a preliminary injunction would serve the public interest. *Mich. Bell Tel. Co.,* 257 F.3d at 592.

First the Court must consider whether Plaintiffs will suffer irreparable injury if a preliminary injunction is not issued. Plaintiffs contend that increasing the make allowances decreases the minimum price that producers receive for their milk. In support, they cite the USDA's own economic analysis, which estimates that producers will lose an average of $125 million per year over the next nine years (Economic Analysis, *supra*, at pp.13, 15). If the Court were to rule in Plaintiffs' favor at a later date, however, they would not have any monetary recourse.

Defendants do not contest that Plaintiffs will suffer a reduction in milk prices. Instead, they claim that Plaintiffs do not satisfy the "irreparable injury" prong because Plaintiffs have not shown that their injury was a direct result of the alleged failure to consider the Section 608c(18) factors. Specifically, Defendants claim that Plaintiffs failed to show that the result of the rulemaking (*i.e.* the make-allowance increase) would have been different had those factors been considered. The parties and *amici* filed supplemental post-hearing briefing on this issue (Doc. Nos. 42 through 46), but no one produced a case directly on point. The Court has similarly found a surprising dearth of case law on this issue.

Even if we assume that Plaintiffs have met their burden of demonstrating an irreparable injury, this factor is offset by the substantial harm that Defendant-Intervenors and other handlers would incur if an injunction is granted. Plaintiffs insist there can be no injury to handlers by merely maintaining

12

the *status quo*, but this is not the case. Just as Plaintiffs and other producers will lose unrecoverable revenue if the Interim Order is not enjoined, an injunction would cause Defendant-Intervenors and other handlers to lose revenue without recourse. The potential harm to Defendant-Intervenors and other handlers is no less real than the potential harm to Plaintiffs and other producers just because it is currently the *status quo*. Indeed, the USDA recognized the harm that the *status quo* was causing handlers when it found that emergency conditions existed. *See* 71 Fed. Reg. 67467, 67477 (Nov. 30, 2006)

The public interests at issue are similarly offset. Plaintiffs claim that it is not in the public interest to "cripple many dairy farmers" (Pls' Memo., Doc. No. 4, pp. 14-15). The exact same thing can be said about the emergency conditions facing dairy manufacturers. In their initial brief, Plaintiffs articulated the most important public interest at issue here: "[m]aintaining a viable dairy industry in rural America." *Id*. at 14 (citing *St. Albans*, 68 F. Supp. 2d at 391-92). This interest is not served by favoring one aspect of the industry (producers) over another (handlers).

## CONCLUSION

Plaintiffs have failed to show that they are likely to succeed on the merits, and any irreparable harm that Plaintiffs may suffer is offset by the harm to Defendants should an injunction issue. Further, there are no significant public interests that weigh in favor of granting a preliminary injunction. Accordingly, Plaintiffs are not entitled to preliminary injunctive relief, and Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 3) is denied.

A telephone status conference is scheduled for **Wednesday, February 28, 2007, at 8:30 a.m.**

IT IS SO ORDERED.

              s/ *Jack Zouhary*
              JACK ZOUHARY
              U. S. DISTRICT JUDGE

              February 22, 2007